The next case today is Azurity Pharmaceuticals, Inc. v. Edge Pharma, LLC, Appeal Number 21-1492. Attorney Hume, please introduce yourself for the record and proceed with your argument. Thank you. Good morning, Your Honors, again, or afternoon, rather. James Hume, representing the plaintiff appellant, Azurity Pharmaceuticals, and if I may, I'd like to arise in the wake of the New England compounding tragedy that occurred in Massachusetts a number of years ago. In response to that, Congress was very concerned about the compounding of drugs and threats to public health, and it enacted restrictions on compounding pharmacies and facilities. As the statute says, and as the FDA has expressly said, the restrictions on compounding drugs ensure that outsourcing facilities do not compound drug products under the exemptions in 503D for use in patients who could use an FDA-approved drug product because the compounding copies of these products would unnecessarily expose patients to drug products that had not been shown to be safe and effective. And that's in the joint appendix at 103 as part of the FDA guidance on compounding and essentially copies. And that's especially true with a facility like Edge's that has a history of violations as alleged in the complaint, and now, as we asked the court to take judicial notice at the end of last year, had to engage in a total recall of all of its products across its product line, including the vancomycin product, that's the subject of this lawsuit. Edge's advertising and sale of vancomycin and its advertising for general hospital use is what this case is about and the false advertising, because it is advertising and manufacturing its vancomycin not for patients who cannot take Fervanc, which is my client's FDA-approved drug, but rather for the cost-effectiveness as hospitals, and that is expressly not permitted by 503B. And that's what the complaint here alleges that Edge is doing. And indeed, it claims that it is a compliance partner with its customers. We submit that the violation of 503B is obvious and clear. It's binary. It's contrary to the plain language of the statute, and it's something that the court should have allowed the case to proceed as they were allowed to proceed in the Allergan cases, in the Hope cases, and a number of other cases that have been in district courts, typically in California. We are not asking the court to regulate Edge's production of vancomycin. Instead, what we've been asking the court to do is to enforce and prevent unfair competition by Edge in what it says about its product. It's been unfairly competing by misrepresenting its compliance with section 503B. This is under the Lanham Act, and as the Supreme Court said in the Palm Wonderful case, you have the Lanham Act and the Food and Drug Cosmetic Act, and they are equal federal acts. And there are only limited circumstances where a claim under Lanham Act would be precluded because of FDA expertise. If you skip over the preclusion point, proponents make an argument that just under the Lanham Act standard of falsity, using the coastal test, I guess it's the Ninth Circuit's coastal test, since what you're complaining about is a misrepresentation as to their status under law or regulation. The test of whether it's false has to account for the fact that a representation about legality has an opinion component to it. So how do you address that aspect of their briefing? I think, Your Honor, they are making factual statements that they are in compliance with 503B when they are not. Making factual statements that they are in compliance with 503B when they are not. That is not an opinion. Now, just so I understand, there is one statement where they say that they comply with all state and federal regulations and guidance, but in that statement, literally, they don't say that they're in compliance with 503B. That is correct, Your Honor. Where do they say that they are in compliance with 503B? They say that they are a pharmaceutical sterile and in order, under the statute, there are 11 criteria in 503B and a facility has to meet all 11. The last one is that everything made there has to comply with 503B. If they have one product that does not comply, they are not a 503B facility. They say, as your compliance partner, we are dedicated... Now, there is a thing in the record that they are registered. Yes. And are they Why isn't it at least possible to read that statement as literally true and then there would just be a question of whether we give off the impression that they were saying more than that they were registered under 503B? Well, I think that the statement that they are registered 503B is literally true, although... I'm sorry, the statement about being a 503B outsourcing facility, is that different than being registered under 503B? I think it is because... Well, doesn't 503B deal with outsourcing or not? It does deal with outsourcing. Absolutely. So, if you're registered under 503B, what's the difference between saying I'm registered under 503B and I'm a registered 503B outsourcing facility? Well, they say more than that. They are the compliance partner. They focus on compliance with 503B and we say they're not complying with 503B. Now, we just said the words compliance partner, I guess. What does that mean? I think that would mean we could certainly argue that it suggests that they're experts at compliance and they're complying with 503B when they're not. And that's the essence of the claim here, that they're representing that they're in compliance with 503B when they're not. And I that is on page six of their brief. Yeah. I'm back a step from whether they are complying with it. I'm just trying to figure out what you think is the clearest statement where they represent that they are in compliance with 503B, as opposed to being registered under 503B, as opposed to being in compliance with the regulations and guidance of the FDA. I think the two statements which are highlighted in the complaint that don't refer to registration are that Edge Farm is a pharmaceutical, sterile, and non-sterile 503B outsourcing facility. And then the other statement, as your compliance partner, we are dedicated providing turnkey 503B outsourcing with the highest level of quality, easy ordering, and simple logistics, and excellent customer support. The highest level of quality, and remember, this is just allegations of the claim. We haven't gotten into discovery here. I think it's belied by their rather sordid inspection history and repeated violations, and finally culminating in this recall. That's certainly relevant to whether they're providing the highest level of quality, and that's the essence of one of the allegations here. So I thought that the problems they ran into had to do with labeling, as opposed to what you're tying them, or do you need to? Well, they must have good manufacturing practices, and the recall is certainly evidence that they didn't, but we're really not dealing with evidence. We're dealing with allegations at this point in the complaint. Isn't the allegation the violation of the prohibition on the essentially a copy language? Yes, and I think that's the key allegation here, and it's interesting what they say. Did they run into problems with that in the past? Not with the alleged that? No. We do. In paragraph 24, we allege the essentially a copy. This was actually then briefed below, and if you look at the addendum, you'll see that it's a major part of my argument to the district court on this at 33 and 35, where we went into the essentially a copy in great detail, and it's this case different from the others. Even worse is Edge doesn't claim any sort of clinical difference for its product. It says the only difference, and I'm going to quote it from page six of their brief, which is taken directly from its CEO's declaration. The difference is very significant, especially in a hospital setting. Each Furvan kit is designed for a single patient. It contains one course of treatment with multiple doses, but in a hospital, it is not uncommon to administer less than the full course of medicine before the patient is discharged or recovers. If the hospital wishes to use the remaining medicine for another patient, the hospital must engage in the process of compounding, which will require the hospital to comply with various compounding standards. Many hospitals cannot meet these standards, and as a result, they cannot use Furvan in this fashion. These problems do not exist with Edge's vancomycin product, because as explained above, Edge's product is sold and they're ready to administer a single dose syringe. Now, that's not the standard in the statute. The statute, and this is the plain language of the statute, says that it's essentially a copy. If they make a drug, a component of which is a bulk drug substance that's a component of an approved drug, that's vancomycin. I don't mean to interrupt, but I'm going to anyway. I'm just trying to pin down what might be a rather minor point, but I'm not sure. I get the allegation that the representation, whether it's opinion or factually provable, that we are in compliance. You've alleged that they're not in compliance with respect to the essentially a copy, but you keep going back to this, and they ran into trouble before, but I fail to see the connection between the kind of trouble they ran into and what is being alleged now. It may not hurt your case, but I'm just trying to understand what the weight of this prior violation problem is. The prior violations have gone to lack of sterility. There's been a number of problems way beyond labeling for other drugs. As I say, culminating in a full recall of everything, including this vancomycin. I've heard after the complaint, but certainly we could allege that again, when at the same time, they're providing the highest quality. The allegation is they're not doing so. The inspections show that they're not operating with the highest quality, despite the fact that that's what they're advertising. But even more importantly, they're advertising across the board. They're basically saying, we're more convenient and we're cheaper, but that's not what the statute says. The statute says there must be a quote, change that produces for an individual patient, a clinical difference as determined by the prescribing practitioner between the compounded drug and the comparable approved drug. Now, the district court didn't focus on that language, even though we argued it. It's plain statute. Can I get you just to talk about the particular statements because the claim is not about the general. It's this particular specific statements have to be false and mislead. Right. So with respect to this point that you're making, this doesn't seem to relate very well to the I'm in compliance with FDA regulations and guidance. Are you saying it does? I'm saying it does because what they are advertising is that their product is more convenient and cheaper. No, no, no, no. I don't. I want to use the words they use that you're saying are actionable, not your words for them. The words that they use is that we are compliant with FDA regulations and guidance. Right. Yes. As your compliance partner, we're dedicated to providing turnkey 503B outsourcing. Let's take that. They do not do that. That is false. They're not dedicated to that. They're not providing 503B outsourcing. But the statement is that they're dedicated to that. And as your compliance partner, I think the implication from that is that we will. So that's not a literally false statement that suggests that you're saying it's got an implication that would require some allegation about how it would be received, correct? Yes. Yes. So what's in your complaint that supports that allegation? I think we've alleged in the complaint that there's confusion in the marketplace and that they're creating the impression that it's perfectly permissible for them to sell the vancomycin purely because it's in a single dose package and it's more convenient than the 503B outsourcing facility. And where will I find in the complaint about the misleading impression with respect to that is where in the... Well, you don't have to tell me. I can find it. But I take it and just the allegation that there is confusion in the market is enough at the 12B6 stage. I think so, your honor, at this stage. Yes, absolutely. We're dealing with allegations and complaint and inferences need to be taken in our favor. In fact, the other advertising cases, particularly Allergan, were allowed to go way past that. Actually, one of them went to trial, the Imprimis case, resulting in a verdict for the plaintiff and then a judgment entered by the district. And just to take me through, what statement do you think is your best statement for additional allegations? That their facility is compliant with the Food and Drug Administration. With what? They say our facility is compliant with the Food and Drug Administration. I thought I said it was compliant with the regulations and guidance. With the regulations and guidelines. With the following state, local, and federal regulations and guidelines. Yes, so what is not in compliance? What is not compliant with those regulations and guidelines? They are acting illegally under 503B to manufacture and sell vancomycin in a way that is not permitted. In other words, there is no change that produces for an individual patient a clinical difference. They don't even purport to claim one. I think that's what makes this case different from some of the other cases where at least the you also alleged. Now that one, there is guidance from the FDA saying that they're not going to prosecute people that are on a nominated list. Well, but figure it. Yes, well, there's a timing issue here. Resurity, or rather, EDGE went to market according to the declaration in February of 2018. The first nomination for the Category 1 list did not occur until June. There's a period of at least four or five months where EDGE was operating without any sort of implication that vancomycin would ultimately be on the list. It hadn't been nominated yet. You almost have two lawsuits here. You have the one for the past conduct and one for the ongoing and the future conduct. The district court didn't address at all the past conduct where there had been a change. Clearly, we would have the right to pursue damages for the conduct when vancomycin was not on the Category 1 list. Although we think we can also pursue the Category 1 as some of the courts have pointed out, just because the FDA has not taken action doesn't mean that the conduct is permissible or lawful under the statute. We think that the language of the statute is clear. It must be on the clinical need list and it is not at this time on the clinical need list. Let me pause you there, Mr. Hume. Additional questions from the court at this time? All right, you've reserved some time. Thank you, Your Honor. We will hear from Mr. Fliske. Thank you, Your Honors. May it please the court. Rob Fliske for EDGE Pharma. Before I with my prepared argument, I wanted to address a line of inquiry that Judge Howard and Judge Barron separately initiated because I think there's a clear answer that you did not receive. First, Judge Howard asked, what is the connection between prior audits and inspections of EDGE and this case? The answer is none. The FDA has never found that EDGE's vancomycin product violates 503B because it was compounded using a bulk drug substance. The FDA has never found that EDGE's vancomycin product is essentially a copy of Furvank and that's despite reviews, inspection reports, and audits. So, to be clear, the FDCA violations alleged here have never been found by the FDA. So, I think there's a clear answer there on that point. Is it dispositive? Would that be dispositive? It is not dispositive, Your Honor, but I was just trying to address the question. Is there some link between these, what I see as atmospherics in the actual case here? The truth is there's not. It is also relevant to the preclusion point because it underscores what's going on here. We have a private competitor litigant alleging FDCA violations that the FDA has not pursued or found. Before you get to the preclusion point, just on the narrow two points that your opponent raised about falsity that I'd just like to get your response to, they allege from the period, and I don't have the dates exactly, but there's an interim period, I guess before 2018, in which EDGE was compounding with a substance that wasn't even on the nominative list. Is that right? Your Honor, that's the first I've heard that. Is that alleged in the complaint? I don't believe it is, Your Honor. Okay. That there was, what's clear in the complaint, what's alleged in the complaint is that vancomycin is a category one substance. That's undisputed. And because it's a category one substance, that means it's been nominated for inclusion. Well, does the allegation allege that EDGE was engaged in the marketing of that drug prior to it going on the nominating list? In other words, just the timing, wouldn't it match up with some of that time period before that's on the nominating list? Your Honor, I don't see the allegation in the complaint. Does it allege the period in which it was marketed? I'm looking. The complaint sets the May date, May 18 date, which is the correct date. And the 2017, the interim drug policy is 2017 policy. And according to paragraph 40 of the argument on that. Okay. One follow-up question to that and then one more that's a narrow factual point. If EDGE was alleged to be marketing a drug not even on the nominated list for any period of time, wouldn't the statement that it was in compliance with FDA regulations and guidance be literally false? Your Honor, no. First of all, I don't, and I was going to get this in a minute, I don't see that statement on the website of the allegation of the complaint. So first, I don't think the statement is there. And it still would not be false because I'm unaware of any FDCA regulation, even if we assume there was this earlier interim period, that would have been unlawful. I thought the statute required it to be on a list. And then there's guidance that says we won't prosecute you if you're on the nominated list. It's hard for me to see how you could be 503B compliant with the FDA guidance. You were marketing a bulk substance that wasn't even on the nominated list. Well, Your Honor, I think, I believe it's the guidance, the 2017 guidance that sets forth these requirements. And is there guidance that suggests you don't even have to be on the nominated list? No, but the guidance is 2017, right? So I'm unaware of a statutory provision that would be violated under the FDCA, separate from the guidance, based on what counts as alleging. Shift over now to the physician point that they make, that there's no indication that the prescribing physician or any prescribing physician has made the statement about the clinical benefit or the distinct clinical benefit of the drug in question. That's true, right? There's nothing in the record suggesting there is any such physician statement. No, there's nothing in the record suggesting that, but that's because it's not pleaded in the complaint. So in the complaint, there is no allegation about lack of clinical difference or lack of documentation relating to clinical difference. The complaint focuses on essentially a copy and the briefing below focused on the key definitional element of essentially a copy, which is whether or not Edge's vancomycin product was identical or almost identical to Furvank. This new focus on lack of documentation regarding clinical difference is not in the complaint. Now, even if it were, even if it were, I still think a Xerdes case is precluded because determining whether or not there's a clinical difference or a clinical need... I guess, but just, but you would concede then it would be literally false. That's different than preclusion. You don't get to preclusion unless it's literally false. If there was an absence of documentation showing clinical difference and Edge stated that it possessed documentation regarding clinical difference, or if Edge stated it satisfied both separate prongs of 503B and there was a statement in that regard, we'd have a statement, Your Honor, but we still would have a legal opinion, okay? Which, so I don't believe it would be literally false because, and we go through this in our brief, generalized statements about compliance with administrative law are not actionable under the Lanham Act. That's particularly so when the administrative body at clearly on the compliance that's referenced by the statement. We cite the Dial-a-Car case, the Greenwich Taxi case for that proposition, and I think that basic idea runs through all the preclusion law as well, which is that an Article III federal court should not try to anticipate what the Article I agency is going to say. The argument you're making now hinges on it not being clear. I'm guessing, I'm asking, suppose it was clear. Your position then, this is dependent on preclusion, right? No, Your Honor, because if, let's assume hypothetically, I think it is a hypothetical because Edge doesn't say this, that it said, we comply with 503B because our vancomycin product has a clinical difference over Furvank. I believe that would be a legal opinion. So one, I think under the Lanham Act case law, like Dial-a-Car and Greenwich Taxi, it wouldn't be actionable. Two, even if I failed on that one. Just on the first one, I was wondering, why is that a legal opinion rather than just a representation about what the law is? If the law clearly is not that, how can it be just an opinion? I guess, Your Honor, it would depend on the clarity or direct nature. Okay, that's what I've got. I got it. Right, so if the statement were, we comply with 503B, I think that's not actionable. If the statement were, we have the XYZ document in our file, that might be a different situation. Still think preclusion might apply, but then at least we'd have a target for a Lanham Act claim. We lack that here. We don't have that. What if the statement were, our product is not essentially a copy? Your Honor, that I believe still would raise two arguments, two problems for us. One, it would be a legal opinion. That's a legal test. And two, it would there be... It is. There would be facts you would need to muster to prove that standard. The FDA, which I was going to get to in a minute, has urged courts and litigants not to interpret or litigate that standard in court because its guidance is interim, non-binding, and it is about to be revised and clarified. Now, I will say, of course, Edge does not make that and it's not alleged that Edge makes that statement. If we look at the complaint and just the inquiry that Judge Barron indicated about where is the falsity, what are the statements? Paragraph 61 of the complaint itemizes the allegedly false statements. So before we get to a preclusion, as a Lanham Act plaintiff, a purported Lanham Act plaintiff, a Xerde must identify false statements of fact made by Edge. You just heard a Xerde's best examples of the false statements of fact. They are simply not false statements of fact, or they're statements of fact that are indisputably true. For example, the first statement, Edge Pharma is a non-sterile 503B outsourcing facility. That's indisputably true. The plaintiff pleads it in its complaint. They're registered under... I think you know exactly what point I'm hung up on, which is essentially a copy, which I thought would come under the allegation that the claim is made that they're compliant with the various following federal and local rules and regulations. Even though there isn't a specific statement, they're arguing that it's implicit in the statement. If you could just address that for me, because I think it's an important point that I've not addressed yet. Could you address it not under preclusion first, just so I'm straight on your view about that question, and then you can get to the preclusion point? Sure. From a Lanham Act perspective, the statement is very general, that the facility is compliant with state, local, and federal regulations and guidelines. That generalized statement about compliance with administrative guidelines is not actionable under the cases that we cite, the Lanham Act cases in our brief, Dial-a-Car, Greenwich Taxi. It's not a factual statement. It's a generalized opinion about compliance with the law. Law that is not subject to CFR regulations at this point. It is only subject to recommendations and non-binding guidance. Now on the preclusion point, which when it comes to essentially a copy, I think is more important. As we argued below, and explained on appeal, the essentially a copy test is subject to 2018 non-binding recommendations. In connection with two cases pending in the center of California, the FDA itself submitted an affidavit urging the court not to interpret the essentially a compliance action on it, on the facts at issue here. More importantly, the FDA intends to clarify and revise that guidance. That declaration and the letters supporting it from the FDA are in the joint appendix at 482 to 494. What we have here, look, I think there's no dispute that a Lanham Act claim predicated on the FDCA is precluded if adjudication of it would directly conflict with agency policy decisions. The agency at issue has told us what its policy is here. It said, stop, time out. We urge the court not to wade into these waters yet, because we're dealing with interim non-binding guidance that's going to be revised and clarified. To me, it's the clearest case of preclusion that one could imagine on those facts. I would also note one final point that even the impremise case, which is already relies on throughout its brief, even that case notes when distinguishing the issue before it from more complicated issues, the impremise case noted that the essentially a copy provision was the very type of thorny question that court should refrain from addressing. That's impremise at page seven. So, your honor, that's, I think my time is up, although I'm happy to continue if the court would allow it. Let me ask the panel if there are avenues of questions they would like to pursue. Why don't you take a minute and wrap up then? Okay. So, one more quick point in the bulk substance arguments, because I didn't address that. So, the other FDCA provision that already alleges that EDGE breached was using a bulk drug substance that is not on a 503 bulks list. And as your honor has already noted, the FDA has expressly stated that it does not intend to take action against an outsourcing facility for compounding a drug from a category one bulk drug substance. Vancomycin is such a substance. So, the agency... I thought the guidance said that was true only when it was on the nominated list. Well, your honor, the guidance, I think, came out at the time it came out, it had the list. So, what's in the record is the 2017 interim drug policy guidance. And that is where that comment is, JA95. And that comment is not limited by the idea that it has to be at least on the nominated list? No, it would be, your honor, because a category one substance is something that's nominated for the list. So, the allegation is that at least for a period of time, EDGE was dealing with a bulk substance that was not even on the nominated list. Your honor, I'm not following that allegation. I don't see it in the complaint. The guidance is from 2017 and Vancomycin is a 2018. Got it. Okay. Yeah. So, I... Yeah. And the final point is this. Azzurri alleges that EDGE violated the Lanham Act because it allegedly violated the FDCA. Make no mistake, to succeed here, Azzurri must prove FDCA violations. Palm Wonderful did not open the door to those types of cases. And the Federal Circuit in Ameren the International Trade Commission cited on pages 23 to 24 of our brief noted this very important point. In Palm Wonderful, the plaintiff's case did not depend on proof of FDCA violations. In Palm Wonderful, the plaintiff could prove its Lanham Act case based on testing the product against the label. Here, our case here exists only because of alleged FDCA violations. And for that If I can just ask this one question. So, in your view, are Hope Medical and Imprimis hopelessly in conflict? Or is there some tension that it's easily to resolve between they're not in conflict with each other? Sure. So, here's how I think that they're not in conflict and how those cases can be reconciled. So, Hope Medical involves state preemption issues. Now, of course, sometimes state preemption principles are informative of the preclusion analysis. But in Hope Medical, there was a specific state statute, California statute, at issue. And the question before the court there was whether or not those specific state statutes, which the court noted under California law, state statutes have a sense of primacy or under the FDCA. That was the question being addressed there. And there it appears that the plaintiff had specifically pleaded that the defendant had not maintained certain documentation of clinical difference. Now, your Honor, you mentioned Imprimis. So, Imprimis dealt with federal preclusion, and the test that I think applies here. And the court in Imprimis noted that determining whether or not a drug is essentially a copy is not for the court to decide. That's for the FDA, particularly given the fact that we don't have regulations on point that specifically identify what it means to be essentially a copy. So, I do think they're reconcilable, factually and legally. Additional questions from the court? Thank you, Mr. Vlesky. And Mr. Hume, I think you reserved three minutes. Thank you, Your Honor. And I have three points to make. One question was asked about the inspections, and there were 503B labeling issues identified. The 11th requirement under 503B is that the drug is compounded in an outsourcing facility in which the compounding of drugs occurs only in accordance with a section. So, if there's a 503B issue with one drug, it invalidates all of the 503B drugs that the facility makes. There is, on Palm Wonderful, the court pointed out, and again, that's a LATIMAC case, that there's a very salutary purpose that competitors are much more attuned to marketplace forces, and they should be allowed to pursue those claims unless there are very limited circumstances. And that's exactly what happened here. The FDA clearly isn't paying attention to the advertising, but we are, and we think that makes it actionable. And finally, what makes this case different from almost all the other cases is that EDGE does not purport to claim a clinical difference. This is not a matter of FDA expertise. This is not a matter of FDA rulemaking. It's the plain statutory language. Could you just suggest, before you sit down, the question about waiver on that for failing to make that allegation with respect to the physician representation in your complaint? And then also, could you just address the timing issue regarding the bulk substance question and whether it was on the nominated list for any period of time? As to that, and this is not specifically in the complaint, but I think, at a minimum, we should have been allowed free amendment, consistent with the rules, if there were issues like that. Our investigation has revealed that vancomycin was not nominated to the FDA until June of 2018, four or five months after EDGE says it was selling it. So, there's a gap there. But there's nothing in the complaint? No, that's something we determined after the point in time. So, it's not specifically in the complaint, but it could be if we got a chance to do so. And then, as to the, I'm sorry, the other issue you wanted to mention? The physician representation with respect to that. The contention was that there was nothing in the making that allegation. Yeah. Paragraph 24 identifies essentially the copy and the guidance, but there is not the detail. But I think it certainly complies with notice pleading. I can put them on notice. And as I say, it was extensively argued, if you look at the addendum before the district court in the motions hearing. So, it was certainly raised. In fact, I kept complaining that EDGE was not saying anything about it because they're not claiming clinical difference. And I think that's what makes this case different. You're just, we're asking the court. It's a clear application of the statutory language that the FDA cannot change through either rulemaking or any guidance or anything like that. That's what the statute says, that there must be a clinical difference for the patient outcomes as determined by a prescriber. They're not advertising for that. And they're not even claiming in their papers that there's a clinical difference. Whereas in the other cases, at least the compounding pharmacy was and we think that's enough for us to proceed. In the other cases, once they got a discovery, they found all sorts of statements that the sales representatives were making, they were alleged to violate the Lanham Act. You obviously don't get those going in. In the Imprimis case, a website statement that they operated under the regulatory framework and the USA and state pharmacy laws sound to be sufficient to allow the Lanham Act claim to be approved. Thank you. Thank you both, counsel.